Plaintiff, Tex-O-Kan Flour Mills Company, a Delaware corporation, brought this suit against the defendant, Guy N.F. Nord, a resident of Belize, British Honduras, to recover the sum of $1217.58 representing the purchase price, including freight charges, etc., of 300 jutes of flour which it avers was sold and delivered to the defendant in accordance with his order. Upon alleging in its petition that defendant was a nonresident and that the Whitney National Bank of New Orleans was indebted to him, plaintiff secured the issuance of a writ of attachment of funds belonging to the defendant which were on deposit with the Bank.
The absent defendant, appearing through a curator-ad-hoc who had been appointed by the court to represent him, resisted plaintiff's demand on the ground that the flour which had been delivered under the contract was sour and musty and, hence, unfit for the purpose for which it was purchased. After a hearing in the lower court, there was judgment in favor of defendant dismissing the suit. Plaintiff has appealed from the adverse decision.
We find the facts of the case to be as follows: Plaintiff corporation is the owner and operator of several flour mills which are located in Texas, Oklahoma and Kansas. One of these mills is Burris Mill Elevator Company Of Dallas, Texas, which manufactures a brand of flour called "Cinco Rosas". The defendant is a commission merchant dealing in flour and other commodities at Belize, British Honduras.
On May 16, 1941, defendant ordered from plaintiff, by wireless telegraph, 700 jutes of "Cinco Rosas" flour. This order was accepted by the plaintiff by reply cable, which stipulated a price of $3.30 per jute and terms of shipment F.A.S. Mobile, *Page 52 
Alabama. In accordance with this contract, 400 jutes of flour were shipped by plaintiff and received by defendant. This shipment was paid for and there is no controversy over it.
On July 24, 1941, defendant radioed plaintiff as follows: "Ship promptly via New Orleans balance 300 jutes * * *." And, on the same day, defendant wrote plaintiff, via airmail, stating: "I confirm my radiogram to you on this morning requesting prompt shipment of the balance of 300 jutes CINCO ROSAS still pending against contract No. 7458. There is a sailing of the United Fruit Company's line from New Orleans, La. on the 2nd Aug. and I hope you will have ample time to get the shipment down to New Orleans to catch that sailing. If not please route the shipment instead to Mobile, Alabama in care of the Van Henegan Co. of that city as before. If at all possible, however, would like the shipment by the United Fruit Company's sailing on the 2nd because I will be short of flour if shipment cannot be effected by that opportunity."
Conformably with the foregoing instructions, plaintiff undertook, on July 30, 1941, to ship the flour from a mill owned by it in Galveston, Texas, to New Orleans. The flour was delivered at Galveston to the Gulf, Colorado Santa Fe Railway Company and was consigned to A.E. Hegewisch, Inc., plaintiff's forwarding agent in New Orleans. Upon its receipt of the inland bill of lading from plaintiff, A.E. Hegewisch, Inc., delivered it to United Fruit Company at New Orleans and secured from that company another bill of lading, dated August 1, 1941, wherein it was stated that the flour was received in apparent good order and that it was being shipped by plaintiff, via the vessel Lysefjord (which was expected to sail on August 2, 1941), to defendant at Belize, British Honduras. At the time A.E. Hegewisch, Inc., obtained this bill of lading from United Fruit Company, the flour was still in transit on the railroad and reached New Orleans on the following morning, August 2d, over the lines of the Illinois Central Railroad. Upon its arrival the Illinois Central Railroad immediately notified the office of A.E. Hegewisch, Inc., but apparently, through error or inadvertance in that office, no effort was made to have the flour brought to the dock of United Fruit Company so that it could be loaded on the steamer Lysefjord which sailed on August 2d at 3:20 P.M. It is also evident, from a notation contained on the bill of lading issued by United Fruit Company, that Mr. Hegewisch, who was handling the transaction for plaintiff, was under the impression that the flour would arrive in New Orleans over the line of the Texas N.O. Railroad, whereas the freight car containing it was routed over the lines of the Illinois Central. This fact is confirmed by the testimony of Mr. C.J. Sheppard of the Illinois Central Railroad, who stated that he was waiting for an order from the consignee, A.E. Hegewisch, Inc., and that the latter mailed, through mistake, the delivery order to the T. N.O. Railroad. This witness also says that the order to deliver the freight car to United Fruit Company docks was finally given to him on August 6, 1941 at 10:00 P.M.; that, when he received it, he communicated with the Public Belt Railroad and that the flour was delivered to the United Fruit Company by the Public Belt Railroad on August 7th at 11 o'clock A.M. The flour thereafter remained on the docks of United Fruit Company until August 16, 1941, when it was loaded upon the vessel "Baja California" in compliance with another bill of lading issued by the United Fruit Company on August 16th to replace the one dated August 1st and which contains the notation "to fill shortage ex S/S Lysefjord 8-2-41 B/L No. 4".
The "Baja California" reached Belize on August 22, 1941 and the flour was evidently received by the defendant on the following day. We say "evidently received" because the record shows that defendant wrote to plaintiff on August 22d notifying it that the flour had arrived that morning on the S/S "Baja California"; that he had not been able "to pass the customhouse entries through"; that he could not obtain exchange in time for the outgoing mail as the bank would not issue an exchange without presentation of the customhouse entry and that, therefore, he would mail his remittance for the purchase price of the flour on the following Monday. In his deposition, defendant states that he inspected the flour at the customs landing shed at Belize on August 23d; that "there were no outward signs on the bags to indicate that anything might be wrong with the condition of the flour"; that 13 jutes were dispatched from the landing shed to one of his customers, Luis Lui Co. at Punta Gorda; that 50 jutes were carted to another customer, James Brodie Co., and that the *Page 53 
balance of the shipment was removed to his warehouse.
On August 25th, two days later, defendant addressed another airmail letter to plaintiff enclosing a letter received from his customer, Messrs. Luis Lui Co., in which complaint was made that the flour delivered to it was sour. Defendant states, in his letter, that he had been placed in an awkward position because he had no other flour to offer his customers and that he could not absolve plaintiff from the responsibility for having shipped an old stock of flour. On August 27th, defendant again wrote plaintiff advising it that his other customer, James Brodie 
Company, had made complaint in connection with the flour and that plaintiff should supply him immediately with another 300 jutes of sound quality. He further requested instructions as to what disposition should be made of the 300 jutes already shipped, which, he stated, he was unable to sell except as hog feed. Upon failing to get an answer to the letters written by him on August 25th and 27th, defendant radioed plaintiff on September 8th advising it to telegraph instructions as the flour was "taking bugs therefore harmful other merchandise."
On September 10th, plaintiff communicated with defendant, by radiogram and airmail letter, stating that it was surprised at the complaints made by defendant as the flour was in good condition at the time it left its mill. It also requested that plaintiff send a sample of the flour to be tested in its laboratory. Defendant complied with this request and, on September 19th, plaintiff wrote defendant advising him that its laboratory inspection of the sample of the flour revealed that, although it was found to be slightly musty, it was usable for human consumption and that he should be able to dispose of the lot without further delay.
Thereafter, there was much discussion (by mail and in personal interviews between defendant and representatives of plaintiff) respecting the best course to be pursued in the premises. In all of these discussions, defendant consistently maintained that he was not liable to plaintiff as the flour was unfit for resale at the time of delivery at Belize. On the other hand, it appears that plaintiff's representatives did not deny that defendant's objections were well founded as the correspondence clearly indicates that they sought to have him dispose of the flour for plaintiff's account in the best way possible. Defendant agreed to do this and, at one time, was able to get an offer of $2.20 per jute for the flour. However, this offer was withdrawn before plaintiff accepted it. Finally, defendant sold the balance of the flour at public auction from his warehouse. The amount received from the various sales made by him, in his attempts to dispose of the flour, amounted to the sum of $329.07. As against this, defendant had incurred expenses of $309.77 (which included payment of an important duty and package tax amounting to $270) so that there was a net balance of $19.30 which he remitted to plaintiff.
On this appeal, counsel for plaintiff maintain that the District Judge erred in dismissing the suit for the following reasons:
(1) That it has not been shown that the flour was unsound at the time it was received by the defendant in Belize.
(2) That, even if the flour was defective at the time defendant received it, he is nevertheless responsible to plaintiff for the purchase price because the flour was delivered under a F.A.S. shipment; that, therefore, it was at the risk of the defendant when it was delivered to the wharf of United Fruit Company and that, since the evidence shows that the flour was in good condition at the time it left the plant and since it is also shown that it takes 12 to 14 days for flour to become contaminated, the defects were not apparent until after the flour was in possession of United Fruit Company at defendant's risk.
(3) That the defendant has waived his right to object to the unsoundness of the flour for the reason that he accepted it, after inspection, upon its arrival at Belize; that he promised to pay for it and that he exercised dominion and control over it by selling a quantity of it to his customers, and
(4) Alternatively, if it should be found that plaintiff is incorrect in all of the foregoing contentions, then defendant is liable for the sum of $660 plus the cost of freight and other charges, representing an offer in compromise made by him on September 30th to pay $2.20 per jute for the 300 jutes of flour.
We shall discuss these propositions in their respective order.
We find no merit whatever in plaintiff's first contention that the flour was in sound condition at the time defendant received it. Defendant's deposition exhibits *Page 54 
that, within two days after the time the flour was received, it was discovered to be sour and musty and unfit for the purposes for which it was purchased. There is nothing in plaintiff's evidence which successfully contradicts defendant's assertion. On the contrary, it is conceded by plaintiff's representatives in their correspondence with the defendant, that the laboratory test of the flour sample sent by defendant revealed that it was musty.
The second contention of plaintiff is that, since the flour was shipped F.A.S. New Orleans, it was at defendant's risk from the time it was placed on the docks of United Fruit Company and that, since the testimony reveals that the flour left its plant in good condition and could not become contaminated in less than 12 or 14 days, it is obvious that the deterioration or contamination occurred after the shipment had been delivered to United Fruit Company.
The legal questions presented by the foregoing contention are not open to serious dispute. The underlying problem is whether the law relied on by plaintiff's counsel can be applied to the facts of the case. In the first place, there can be no doubt that delivery of goods under contract F.A.S., which means free aside ship, is complete and relieves the consignor of liability after the goods have been delivered in good order to the dock where the ship is to sail. See 55 Corpus Juris verbo "Sales" section 323, page 334. In such instances, if the goods are lost, injured or spoiled while on the docks of the steamship company or in transit before they reach the consignee, the shipper is not responsible.
But let us see whether that rule is applicable to the facts of the case at bar. Here, we find that the defendant gave to the plaintiff specific shipping instructions — that is, that the flour was to be shipped on the vessel of United Fruit Company leaving New Orleans on August 2d and, in case plaintiff could not comply with this request, then the flour should be sent via Mobile. In view of these orders, it was clearly plaintiff's duty to ascertain whether the flour could be delivered to the United Fruit Company's wharves in time to be transported on the Steamship Lysefjord which left New Orleans on August 2d. Plaintiff says that it complied with these orders by sending the goods to New Orleans in adequate time and that complete delivery was effected when its agent, A.E. Hegewisch, Inc., obtained the bill of lading issued by United Fruit Company for the shipment, which states that the flour has been received in apparent good order.
We do not agree with this proposition for the reason that the bill of lading was labelled "short shipped" which means either that the flour had not reached New Orleans in time for the sailing of the vessel or that the vessel was already loaded to capacity with other goods and unable to take the shipment.
Counsel for plaintiff maintain that the notation "short shipped" on the bill of lading probably meant that the vessel was already booked to capacity. If this be so, plaintiff was derelict in its duty in not ascertaining in advance that the flour could not be transported on the Steamship Lysefjord — for, in such circumstances, it was obligated to ship the flour via Mobile, in accordance with defendant's instructions. On the other hand, if the reason the bill of lading was marked "short shipped" was due to the fact that the goods had not yet arrived in New Orleans, then plaintiff's agent, A.E. Hegewisch, Inc., was negligent in not making certain that the flour, when it arrived, would be delivered to the steamship in time for the sailing — as the evidence shows that the car containing the flour arrived at 6 A.M. on August 2d and the boat did not sail until 3:20 P.M. of that day. Here again, plaintiff's agent is shown to be at fault since the evidence discloses that it erroneously assumed that the flour was being transported over the T. N.O. Lines when, as a matter of fact, it arrived on the Illinois Central.
In view of the foregoing facts, we do not think that plaintiff is in a position to maintain that the flour was at defendant's risk from and after the time it was delivered to United Fruit Company. By its failure to comply with the shipping orders, the flour was in transit from July 30th until August 23d, or for a period of 25 days, during which time it was subject to contamination. Of course, plaintiff had the option of shipping the flour via Mobile, in case delivery could not be made in time for the boat leaving New Orleans on August 2d. However, it did not elect to pursue this course but instead, took it upon itself to ship the flour on August 16th from New Orleans on the "Baja California". This shipment was wholly unauthorized by defendant. *Page 55 
It is well settled in Louisiana that a noncompliance on the part of the seller with instructions respecting delivery of the goods sold is a breach of the contract and that the seller cannot maintain an action to recover the purchase price without first showing that he has carried out his obligation. See Lundy v. S. Pfeifer Co., 162 La. 355, 110 So. 556. Therefore, since plaintiff failed to obey defendant's instructions to deliver the flour to the SS Lysefjord (or in the event it could not be loaded on that vessel to ship it via Mobile), the commodity was at plaintiff's risk until it reached Belize and was accepted by the defendant, notwithstanding the provision in the contract that the flour would be at the risk of defendant from the time it was delivered alongside ship.
And we have little doubt that the flour was unwholesome at the time it reached Belize. The only evidence offered by plaintiff on this score is that the flour was in good condition at the time it left the mill in Galveston and that it takes 12 to 14 days for contamination to affect it. However, since defendant has shown to our satisfaction that (within two days of its delivery at Belize) the flour was found to be sour and musty, it is fair to conclude that it became contaminated during transit and at a time when it was at plaintiff's risk.
The third contention of plaintiff is that defendant has waived his right to object to the unwholesome condition of the flour for the reason that he inspected it upon its arrival at Belize and that he must be held to have accepted it because he promised to pay for it and because he sold a quantity of the lot to his customers. In support of this proposition, counsel cite Ruling Case Law, Verbo "Sales" sections 257, 259, 261; Beedy v. Brayman Wooden Ware Co., 108 Me. 200, 79 A. 721, 36 L.R.A., N.S., 76, Ann. Cas. 1913B, page 275; 55 Corpus Juris, pages 443, 444 and 448; Harrison v. Scott, 203 N.Y. 369, 96 N.E. 755, 38 L.R.A., N.S., 1035; Williston on "Sales", Vol. 1, paragraph 77 and a number of common-law adjudications.
We are not in disagreement with the authorities cited by counsel which merely set forth the general rule of law that a buyer, who receives goods which are warranted to be of a certain standard, has a reasonable time within which to inspect them to determine whether they are of the quality specified in the contract; that this right of inspection may be waived either expressly or tacitly and that, in cases where he retains the goods for an unreasonable time without objection, sells them or does any act consistent with ownership, he thereby estops himself from later contending that the goods were not of the standard or quality warranted by the seller. This doctrine, which is founded on plain common sense, is (like all general rules) subject to many exceptions and modifications. In truth, the facts and circumstances of each particular case determine its applicability.
With these principles in mind, we examine the facts of the instant case in order to ascertain whether the defendant's conduct, after receipt of the flour, was such as would authorize the application of the above-stated rule. Defendant states in his deposition that he inspected the flour upon its arrival in Belize on August 23d; that his inspection consisted of a casual examination of the bags or containers; that "there were no outward signs on the bags to indicate that anything might be wrong with the condition of the flour"; that he had resold a part of the flour to certain retail customers and that he made immediate delivery of 63 jutes to them. Within two days, however (August 25th), these customers of defendant complained that the flour could not be sold as it was sour and musty. Upon being thus advised, defendant immediately made an examination of the flour and ascertained that the complaints were well founded. On the same day, he made complaint to plaintiff via airmail and enclosed the letter which he had received from one of his customers. Two days later, on August 27th, he sent another letter to plaintiff in which he enclosed a letter from the other customer. And, from that time on, he made it very clear to plaintiff, through correspondence and personal interviews, that he would not be responsible for the purchase price of the commodity.
In view of the foregoing circumstances, can it be fairly said that defendant's conduct respecting the acceptance, use or disposal of the flour, has been so consistent with ownership that he has waived his right to contend, in defense of this suit, that he is not liable for the purchase price because the flour was of unsound quality? We think not. The mere fact that he made a casual examination at the time of delivery is not tantamount to an unqualified acceptance on his part. He had a right to assume that the product, which was contained in bags, was fit for the purpose for which *Page 56 
it was bought. Nor is the fact that he immediately delivered a lot of the flour to customers, to whom it had been previously resold, a sufficient predicate to justify the waiver contended for. In fine, a careful consideration of defendant's conduct after he received the flour convinces us that he did what any reasonably prudent business man would have done under similar circumstances.
The evidence falls far short of establishing plaintiff's final and alternative contention that the rights and liabilities of the parties were compromised when it accepted defendant's offer (of September 30th) to pay $2.20 per jute for the flour. Defendant did not offer to purchase the flour for his own account for $2.20 per jute or in compromise of any claim which plaintiff might have had against him. Quite the contrary — the offer was made by a third person and resulted from defendant's efforts to assist plaintiff in the disposal of the flour for its own account so that its loss might be curtailed.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.