**IRBY CONSTRUCTION CO., INC., Plaintiff,**

v.

**SHIPCO, INC., Defendant.**

Civ. A. No. 79–4973.

United States District Court, E. D. Louisiana.

Sept. 22, 1982.

Herbert M. Hill, Orlando, Fla., for plaintiff.

Robert B. Bieck, Roy C. Cheatwood, New Orleans, La., for defendant.

## MEMORANDUM OPINION

CASSIBRY, District Judge:

### FINDINGS OF FACT

**1.**

Plaintiff, Irby Construction Company, Inc., (Irby), is a Mississippi corporation with its principal place of business in Jackson, Mississippi.

**2.**

Defendant, Shipco, Inc. (Shipco), is a Texas corporation with its principal place of business in Houston, Texas.

**3.**

The time period relevant to this cause of action is October of 1974 through August of 1975.

**4.**

Irby, in part through the auspices of the United States Agency for International Development (USAID), obtained a construction contract in Indonesia to install steel power line poles of various sizes. USAID required that Irby ship at least 50% of its materials to Indonesia on American flag carriers. Irby decided to ship the bulk of its material through the Port of New Orleans. One of the American flag carriers serving the Port of New Orleans is Lykes Brothers Steamship Company (Lykes). Irby made arrangements with Lykes to transport the bulk of its material to Indonesia on Lykes vessels and entered into a shippers letter of credit designating Shipco as its freight forwarder.

**5.**

L. B. Gatewood of Irby, now deceased, contacted Merlin Paddock of Shipco to discuss the possibility of Shipco acting as its freight forwarder in connection with the shipment of Irby supplies through the Port of New Orleans to Indonesia. Mr. Paddock sent Mr. Gatewood a letter dated October 10, 1974, together with a promotional brochure, generally describing Shipco's services as a freight forwarder. As a result of Mr. Paddock's letter and brochure, and a subsequent conversation with Mr. Gatewood at Irby's headquarters in Jackson, Mississippi, Irby, through Mr. Gatewood, designated Shipco as its freight forwarder. Neither Shipco nor Irby entered into a written contract, nor executed any memorandum outlining their conversations or understanding with respect to Shipco's performance of its duties as freight forwarder.

**6.**

Irby imposed no duties on Shipco in addition to those customarily performed by freight forwarders in New Orleans. Irby did not specifically inform Shipco of the need for the expeditious handling of any specific items necessary for the Indonesian construction project, beyond stating that it wanted all materials to be placed shipboard as quickly as possible. At no time did Irby inform Shipco that it would seek to hold Shipco responsible for any general, special, or consequential damages of any sort flowing from any failure of Irby material to reach its Indonesian construction project by a certain date or arising from any litigation concerning the shipment of Irby material.

**7.**

Shipco is an independent freight forwarder licensed by the Federal Maritime Commission (FMC) pursuant to 46 U.S.C. § 841b. In exchange for performing freight forwarder services, Shipco charges shippers $20.00 per bill of lading, together with $2.50 for each additional item listed on

a single bill of lading. Shipco charged these same rates to Irby in the instant action.

### 8.

Providing that it complies with 46 U.S.C. § 841b and the FMC regulations promulgated thereunder (46 C.F.R. § 510.24), Shipco receives a commission in the amount of 1.5% of the carrier's charges from the carrier. In the instant action, Shipco complied with those regulations and received commissions from Lykes in the amount of 1.5% of Lykes' carriage charges to Irby.

### 9.

Shipco, like many freight forwarders, performs services not only for shippers, but carriers as well, and typically deals with many different shippers and carriers at the same time. In its business, Shipco represents no carrier or shipper exclusively. Further, Shipco is not subject to control by either carriers or shippers in the method of performing its duties, although it must abide by applicable carrier and governmental regulations. In the instant action, Shipco did not serve Irby exclusively. Irby exercised no control over Shipco's performance of its duties, beyond informing Shipco that it desired all of its materials to be shipped via Lykes.

### 10.

Part of Irby's agreement relating to the Indonesian project required Irby to paint all metal power poles with a coating to enhance their useful life. To meet this requirement of the project contract, Irby entered into an agreement on December 14, 1974 with BASF Wyandotte Corp. (BASF) through its local sales agent, Williamson Sales Company (Williamson) (now known as Williamson Distributing Company). This contract was for the purchase and sale of 4,000 gallons of subalox FD–510 paint ("subalox") for $42,000 "F.A.S. vessel New Orleans", on purchase order number 1512. Irby did inform Williamson and BASF of its special prompt need for the paint, and BASF and Irby agreed that the subalox would arrive in New Orleans no later than December 31, 1974. Although the purchase order listed the destination of the paint as "Irby Construction Company c/o Shipco, Inc., 624 Gravier, New Orleans, Louisiana 70130", it also listed "F.A.S. vessel New Orleans" sales terms.

### 11.

Irby prematurely paid BASF for the subalox on January 27, 1975, without receipt of the "certificate of completion and evidence of delivery" required by purchase order number 1512.

### 12.

BASF contracted with its agent, Ryder Truck Lines (Ryder), to carry the subalox from the BASF division facilities in New Jersey to the Port of New Orleans. The subalox arrived at Ryder's New Orleans dock on either December 30 or 31, 1974. On arrival of the subalox, Ryder's employee, Charles Rogers, telephoned Shipco and also sent a written arrival notice to Shipco, requesting delivery instructions from Shipco.

### 13.

Review by Shipco of the arrival notice revealed that the cargo involved was paint. This raised the question in the mind of the manager of Shipco's New Orleans office, Mr. Paddock, as to the "red label" status of the subalox. Ordinarily, such information would be reflected on the face of the arrival notice, but that was not the case in this instance.

### 14.

Mr. Paddock asked his son, Wayne Paddock, to check the red label issue with Ryder. About January 3, 1975, Wayne called Ryder and was informed that the paint was "red label." Subsequently, still in the first week of January 1975, Mr. Paddock personally called Mr. Rogers at Ryder and asked him to verify whether the paint was "red label." Mr. Rogers informed Mr. Paddock that he had seen the cargo and that it bore "red labels."

### 15.

The significance of the red label status of the subalox, as defined by the Code of Federal Regulations, is that there are certain restrictions placed on the storage of red label materials on a vessel for shipment.

Further, Lykes, with whom the majority of Irby material was being placed for shipment to Indonesia, had a general company policy of not allowing delivery of red label material to its dock prior to 24 hours before loading the cargo onto the vessel. Cargo which was not red label was ordinarily sent directly to the dock by Shipco for storage there until a ship was available upon which it could be loaded.

16.

From this point on, Ryder was in contact with Shipco on several occasions concerning delivery instructions for the subalox. Because the subalox was being treated as red label material, Mr. Paddock had no delivery instructions to give to Ryder since Lykes did not have any vessels with available space for red label or "hazardous" materials at this time.

17.

Mr. Paddock prepared a dock receipt for Lykes on January 6, 1975 and transmitted it to Lykes. Thereafter, Lykes called Mr. Paddock and requested information as to the flash point of the paint. In the meantime, Ryder has sent out "refused and unclaimed notices" of January 13, 1975, and January 20, 1975, to BASF with carbon copies to Shipco. When BASF received the notices, it immediately contacted Mr. Val Guillot at Williamson, the sales agent for BASF in the New Orleans area, because the notices threatened sale at auction of the subalox unless Ryder received delivery instructions promptly. Mr. Guillot called both Ryder and Shipco and received information that the subalox was being treated as "red label." At this time, Mr. Paddock asked Mr. Guillot to furnish him with flash point information for the subalox.

18.

In response to Mr. Paddock's request, Mr. Guillot sent Mr. Paddock "Subalox Coating Technical Data Bulletin" number one which listed the flash point of the subalox as "over 80° Fahrenheit." Mr. Paddock, in turn, transmitted this information to Lykes during the latter part of January 1975. Cargo with a flash point of less than 80° is considered red label (flammable) material and therefore must be so identified. 46 C.F.R. § 146.21–1 (1975). Any cargo with a flash point between 80° and 150° is considered yellow label (combustible) cargo and has to be so labeled. 46 C.F.R. § 146.26 (1975). Nevertheless, Lykes authorities continued to treat the subalox as red label.

19.

On January 20, 1975, Mr. T. Frank Lucroy of Irby had a telephone conversation with Mr. Paddock concerning the subalox. Mr. Lucroy inquired as to why he had received no bill of lading demonstrating that the subalox had been shipped to Indonesia. Mr. Paddock merely advised Mr. Lucroy that the problem was that Lykes had cancelled its January vessel to Indonesia but that the subalox would go out on the next ship. Mr. Lucroy was not advised by Mr. Paddock of any red label problem with the cargo.

20.

During the month of January 1975, Mr. Guillot and/or Harvey Bennet and Jim Kenney of BASF contacted Mr. E. Brown Briggs of Irby and informed Mr. Briggs of the red label problem, the inability of the subalox to get to the docks, and Ryder's threats in its "refused and unclaimed notices" to dispose of the subalox. (Mr. Briggs bore the primary responsibility for the coordination of Irby's support for the contract). Apparently, Mr. Briggs failed to properly digest the information and take action; he did not communicate this information to other Irby personnel.

21.

Ryder, through Mr. Rogers, continued to call Mr. Paddock at Shipco and Mr. Guillot at Williamson concerning the subalox. Ryder sent a notice to Shipco and BASF threatening the sale of the subalox if delivery instructions were not tendered and all demurrage charges paid.

22.

In response, Mr. Paddock informed both Mr. Guillot from Williamson and Mr. Rogers from Ryder that:

a.) Shipco would, on behalf of Irby, guarantee payment of the demurrage charges then accruing on the paint at the Ryder facility (Mr. Paddock gave this guaranty without representing to Ryder, BASF or Williamson that Irby was, in fact, primarily liable for the demurrage charges);

b.) Lykes had cancelled its January, 1975 vessel so that the subalox could not, therefore, go out until the Lykes February vessel sailed, at the earliest, and, because the subalox was red label, it could not be delivered to the Lykes wharf until less than twenty-four hours prior to the actual sailing of the Lykes vessel.

Mr. Paddock had a similar conversation with Jim Bullinger of Ryder.

23.

On February 24, 1975, Ryder sent out a second notice to Shipco and BASF to the same effect as the February 19th notice threatening sale of the subalox if all demurrage charges were not paid and delivery instructions tendered.

24.

Mr. Paddock testified that, on the basis of his past dealings with truck lines, he felt that Ryder's employees, Mr. Rogers and Mr. Bullinger, had accepted his guarantee of payment of the demurrage charges on behalf of Irby, and had understood the impossibility of giving final delivery instructions until twenty-four hours before the Lykes vessel was to sail.

25.

Lykes declined to accept the subalox on its February 6, 1975 vessel, stating that because the cargo was red label, it could not "marry" other cargo to be shipped on that vessel. Mr. Paddock communicated this fact to both Ryder and to Mr. Briggs and Mr. Lucroy of Irby and to Mr. Guillot of Williamson. Mr. Paddock assured Ryder that the subalox would go out on the very next vessel in March, 1975, and believed that Ryder had accepted his representations and would not take any adverse action with the subalox.

26.

A Lykes vessel left New Orleans bound for Indonesia on February 6, 1975 with Irby material aboard. There was space available on this vessel for non-red label material.

27.

Mr. Paddock believed that Ryder's notices were primarily directed to BASF and Williamson since under the F.A.S. terms of the sale, the "risk" for the goods remains with the seller until the goods are delivered alongside a vessel.

28.

A Lykes vessel left New Orleans bound for Indonesia in March of 1975 with Irby material aboard. There was space available on this vessel for non-red label material only.

29.

On or about March 11, 1975, Ryder sent the subalox from its New Orleans terminal to its headquarters in Jacksonville, Florida, where on March 19, 1975, it sold the paint at public auction. Neither Irby, Shipco, Williamson, nor BASF knew about the sale until mid-May, 1975, when one of the auction purchasers telephoned BASF to inquire about the use of the paint. BASF promptly informed Mr. Guillot of Williamson, who, in turn, informed Irby.

30.

On May 12, 1975, Mr. John Ryan of Irby arranged a conference telephone call among the various parties to determine the reasons why the subalox had been sold. During this conversation, Shipco maintained that BASF was at fault due to its failure to properly deliver the subalox. However, no conclusion was reached concerning the matter during this conversation.

31.

Subsequently, Shipco represented to Irby that it had done all that it could to ensure that the subalox reached its destination, and also indicated that it thought the fault resulting in the loss of the subalox was that of BASF due to its failure to deliver the subalox as contractually required.

**32.**

After BASF declined to provide Irby with free paint, Irby traced the subalox to the parties who purchased it at the public auction conducted in Florida by Ryder. Irby repurchased the paint from those parties for a total sum of $15,620.00 for 3,910 gallons of the subalox. Irby was unable to recover 90 gallons of the subalox for which it had paid BASF $945.00.

**33.**

BASF and Williamson failed to resolve the red label issue after Ryder created the problem.

**34.**

Shipco acted in good faith in attempting to get the subalox forwarded to Indonesia, and made no misrepresentations or material omissions in statements regarding the subalox.

**35.**

Shipco performed its services in accordance with its contractual arrangements with Irby. Shipco never contemplated at the time it entered the contract with Irby that its liability as a freight forwarder would be as extensive as claimed by Irby.

**36.**

Shipco reasonably relied on the other parties to the sale to carry out their obligations under the F.A.S. sales terms of the subalox purchase. These other parties failed to do so, however, and this failure was a cause of the injury to Irby.

## CONCLUSIONS OF LAW

**1.**

Due to the diversity of citizenship between the parties, this court has subject matter jurisdiction by virtue of 28 U.S.C. § 1332.

**2.**

■ Shipco did not breach any duties owing to Irby either as a matter of agency or contract

**3.**

■ An agent is liable to his principal for all damages incurred by the principal due to the negligence, or fault, of the agent. *See Rodriguez v. State Farm Mutual Ins. Co.,* 88 So.2d 432 (La.App. 1st Cir. 1955); *McDowell v. National Surety Corp.,* 68 So.2d 189 (La. App. 1st Cir. 1953). However, no negligence by Shipco caused damage to Irby. Shipco acted reasonably in trying to accomplish the purpose of its agency.

**4.**

■ "F.A.S. vessel" means free alongside vessel or ship. *Anglo-Canadian Shipping Company v. United States,* 264 F.2d 405, 408 n. 3 (9th Cir. 1959); *Tex-O-Kan Flour Mills v. NORD,* 18 So.2d 50, 54 (La. App.Orl.1944). Under both custom of the trade and the jurisprudence, a seller of goods under F.A.S. vessel terms, must, among other duties:

(A) Deliver the goods along side vessel at the loading berth named by the buyer, at the named port of shipment and in the manner customary at that port, at the date or within the period stipulated, and notify the buyer without delay that the goods have been delivered alongside vessel;

(B) Bear all costs and risks of the goods until such time as they have been effectively delivered alongside the vessel at the named port of shipment, including the costs of any formalities which the seller must fulfill in order to deliver the goods along side the vessel; and

(C) Pay the cost of any checking operations necessary for the purpose of delivering the goods alongside the vessel.

In sum, a seller of goods on "F.A.S. vessel" terms is relieved of liability only once he has delivered the goods in proper condition to the dock where the ship is to sail, and until such time, risk of loss and responsibility for the goods rests on the seller and his agents. *Tex-O-Kan Flour Mills Co. v. NORD,* 18 So.2d at 54–56.

**5.**

Notwithstanding the "F.A.S. vessel..." sale terms, at least some personnel at BASF and Williamson believed that the sale was merely a sale including freight prepaid to destination, by virtue of Irby's inclusion on purchase order number 1512, in the "destination" block on the purchase order, the words "ship to Irby Construction Company c/o Shipco, Inc., 624 Gravier, New Orleans, Louisiana 70130." BASF and Williamson believed that their obligations to Irby ended upon notification to Shipco that the subalox had reached Ryder's New Orleans terminal. BASF and Williamson's belief, or misunderstanding of, or failure to perform their obligations was unreasonable and was a cause of Irby's injury. Parties trading in goods sold under special terms such as "F.A.S." or "F.O.B." ("free on board"), know, or should know, that these designations determine the rights, duties, and liabilities of the parties, and are not to be ignored or taken lightly.

**6.**

Furthermore, Irby itself is not free from fault. The loss of Irby's goods arose in part from the vagueness of Irby's shipping instructions. Thus, because BASF and Williamson's confusion as to their obligations under the F.A.S. sales terms arose in part from Irby's listing "c/o Shipco" on the purchase order as the destination for the goods under the F.A.S. vessel contract, as opposed to specifying clearly only F.A.S. vessel terms such as "vessel to be designated later," Irby must bear some of the responsibility. Similarly, Irby's premature payment to BASF for the subalox on January 27, 1975, without receipt of the "certificate of completion and evidence of delivery" required by the purchase order, prevented Irby from being able to exert any leverage over BASF and Williamson, and amounted to contributory negligence on Irby's part. *See, e.g., Williams v. State Farm Ins. Co.,* 273 So.2d 680, 681–82 (La.App. 1st Cir. 1973); *Rodriguez v. State Farm Mutual Ins. Co.,* 88 So.2d 432, 441 (La.App. 1st Cir. 1955).

**7.**

Shipco reasonably relied on the other parties to the sale to carry out their obligations under the F.A.S. sales terms, but they did not do so. It was not Shipco who created the red label problem; BASF's agent, Ryder, did. It was not Shipco who had the primary duty to resolve the problem; BASF and Williamson did. Shipco, nevertheless, did take some action; Shipco transmitted to Lykes the information concerning the flash point of the subalox which was given to Shipco by Williamson. Shipco cannot be held responsible for Lykes's refusal to take the subalox based on its alleged own internal regulations. Shipco did not have any primary obligation to control Ryder and prevent its disposition of the subalox; BASF and Williamson did, although Shipco did what it could by guaranteeing payment of the demurrage charges and by informing Ryder of the situation concerning the inability to deliver the subalox to the Lykes dock.

Even if Shipco had a primary duty to inform Irby of Ryder's threats, it could reasonably rely on Williamson and/or BASF to communicate that information to Irby which, in fact, they did. BASF and Williamson's communication of Ryder's threats to Irby was just as effective as if Shipco had communicated those threats.

Shipco did attempt, in good faith, to comply with its duty, as freight forwarder, to fully designate the vessel on which the subalox would be loaded. From the time of the arrival of the subalox in New Orleans until February 6, 1975, no Lykes vessel sailed from New Orleans to Indonesia. Shipco prepared dock receipts and bills of lading for the February 6th vessel, and transmitted the dock receipts to Ryder, but then had to inform Ryder of Lykes' decision not to take the subalox on that vessel due to the subalox's purported red label incompatibility with other cargo. With respect to the March vessel, Shipco again sought to place the subalox on that vessel, but Lykes informed Shipco that it would not take the subalox because of its purported red label status.

### 8.

 A principal is liable for his agent's acts or delinquencies done in the function of the agency when the principal could have prevented their occurrence. *Strawbridge v. Turner,* 8 La. 537, 539 (1835). A principal is bound by his agent's engagements within the power conferred on the agent by the principal. La.Civ. Code art. 2985; *accord, Brady v. Fontenot,* 132 La. 826, 61 So. 838, 839 (1913). Therefore, it follows that a principal has a duty towards third parties to control his agent's actions, *see, e.g., Strawbridge v. Turner, supra,* 8 La. at 539.

Ryder's erroneous designation of the subalox as "red label" caused the delays, in turn leading to accrual of the demurrage charges and, ultimately, to the auction of the subalox. BASF should have known that under the F.A.S. terms of the sale, it bore the risk of loss on the subalox, and should never have permitted its agent, Ryder, to auction off the subalox. BASF is at fault for its failure to control Ryder, and this failure was a cause of Irby's loss. BASF had the duty to see that its agent properly delivered the subalox "F.A.S. vessel."

### 9.

 Although the buyer has a duty to identify the ship and its location, *Internatio-Rotterdam, Inc. v. River Brand Rice Mill, Inc.,* 259 F.2d 137, 140 (2d Cir. 1958), *cert. denied,* 358 U.S. 946, 79 S.Ct. 352, 3 L.Ed.2d 352 (1959), in the instant case, BASF, Williamson, and Ryder were all aware of the red label problem, and they also knew that Shipco could not give shipping instructions until a Lykes vessel willing to accept the subalox cargo was available. In spite of this, and notwithstanding Shipco's assurances and guaranty of payment of the demurrage charges, Ryder caused the subalox to be sold at public auction.

### 10.

 To argue that Shipco should have gone to the risk and expense of either warehousing the subalox or actually paying the demurrage charges on the subalox, particularly when the subalox was still in BASF's constructive possession through that of its agent, Ryder, by virtue of BASF's non-delivery of the material under the F.A.S. terms of sale, is untenable. Shipco had no legal responsibility for the demurrage charges for two reasons. First, an agent is not bound to act at his risk and expense towards the preservation of his principal's property, unless the threat towards that property resulted from the agent's fault. *Fitz v. Hayden,* 1 La. 411, 416 (1830). No fault on the part of Shipco caused the threat to the subalox. Furthermore, in the instant action, the parties never discussed warehousing or payment of demurrage. *See, e.g.,* La.Civ.Code art. 1959. It should also be noted that the final "unclaimed notice" from Ryder sought over $4,600.00 demurrage. According to Mr. Paddock, warehousing, including offloading, loading and offloading again would have cost at least as much. Second, under the F.A.S. sales terms, BASF, and not Shipco, was responsible for the demurrage charges.

### CONCLUSION

Shipco did not breach any duties owing to Irby, and as such, Shipco is not liable to Irby for any damages incurred as a consequence of the subject matter of this litigation.